IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

KELLEY S. STONE,

     Plaintiff,

v.                                                          No. 10-1088

THE CITY OF GRAND JUNCTION, TENNESSEE,
and PAT RYAN and SUSAN TICE, individually,

     Defendants.

_____

ORDER GRANTING IN PART AND DENYING IN PART THE
OBJECTIONS OF DEFENDANTS CITY OF GRAND JUNCTION, TENNESSEE
AND PAT RYAN TO AFFIDAVITS FILED BY THE PLAINTIFF,
AND THE MOTION OF DEFENDANTS CITY OF GRAND JUNCTION, TENNESSEE
AND PAT RYAN FOR PARTIAL SUMMARY JUDGMENT

_____

*INTRODUCTION*

The Plaintiff, Kelley S. Stone, initially brought this action against the Defendants, City of

Grand Junction, Tennessee (sometimes referred to as the "City"); Pat Ryan, individually and in his

official capacity as the Chief of the Grand Junction Police Department; and Susan Tice, individually,

in the Circuit Court for Hardeman County, Tennessee at Bolivar on March 19, 2010. She asserted

violation of the Fourth and Fourteenth Amendments to the United States Constitution pursuant to

42 U.S.C. § 1983, as well as state law claims of malicious prosecution,[1] false imprisonment, false

arrest, intentional infliction of emotional distress and civil conspiracy. The matter was removed to

this Court on April 13, 2010. Before the Court is the motion of Defendants City and Ryan for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The City seeks

_____

[1]*See* n.6, *infra.*

disposition of all claims against it, while Ryan requests partial summary judgment with respect to Stone's false imprisonment and malicious prosecution claims.  He further asserts his entitlement to qualified immunity on the § 1983 claim.  Subsequent to the filing of the instant motion, the Court, in an order entered August 2, 2010, dismissed without prejudice the Plaintiff's claims under the Fourteenth Amendment and against Ryan in his official capacity.  (D.E. 15).  Also before the Court are the objections of these Defendants to affidavits filed by the Plaintiff in connection with her response to the motion for partial summary judgment.  (D.E. 22.)

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted).  "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party."  Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  American Civil Liberties Union of Ky. v. Grayson Cnty., Ky., 591 F.3d 837, 843 (6th Cir. 2010), *reh'g denied*, 605 F.3d 426 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348).  "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

2

bear the burden of proof at trial.'"  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex

Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

*FACTS*

The individual parties to this lawsuit all live in Grand Junction, a town too small to boast so

much as a four-way stop.  Stone works at her family's restaurant, the Junction Café.  (Compl. ¶ 6.)

Defendant Tice also worked at the café for a short time in August 2007 but, according to Stone,

three months later began operating a competing business called Big Al's one block away which

offered almost the same menu.  (Id.; Aff. of Kelley S. Stone ("K. Stone Aff.") ¶ 3.)  Thereafter,

relations between the two women deteriorated.  (Compl. ¶ 7.)  Ryan, who had previously been a

regular at the Junction Café, began eating at Big Al's.  (Id.)

Stone alleged in her complaint that, in December 2007, she gave a written statement to Grand

Junction police refuting a claim that she had made a threatening telephone call to Tice.  (Compl. ¶

8.)  Police warned both women to stay off each other's property or face arrest for trespassing.  (Id.)

On July 25, 2008, the Plaintiff's brother suffered a fatal heart attack.  (Id. ¶ 9.)  Members of the

community, including Tice, gathered at the Junction Café that morning to offer condolences.  (Id.)

Based on her belief that the police warning was an order, she told Tice, in front of several others,

to leave the property "in less than cordial or polite terms."  (Id.)

Ryan asserted in an affidavit that he went to Big Al's on August 1, 2008 to meet with the

mayor at the mayor's request and, on his arrival, Tice asked to speak with him privately.  (Aff. of

Pat Ryan ("Ryan Aff.") ¶ 23; K. Stone Aff., Ex. B (Incident Report).)  He described the incident

thusly:

> She told me that the day before she left the restaurant and turned on Charleston
> Street and stopped at the stop sign at Tippah Street.  She saw Kell[e]y Stone driving

3

a white Buick.  Ms. Stone crossed the railroad tracks and pulled her car in front of Ms. Tice's.  Ms. Tice backed her car up and drove around Kell[e]y Stone.  Ms. Tice turned left onto Tippah Street.  Ms. Stone made a U-turn and followed Ms. Tice very closely.  Ms. Stone followed Ms. Tice to the home of a friend of Ms. Tice's where Ms. Tice was going to play Bunko [sic].  Ms. Tice called her husband and told him what had happened; he told her to report this to the police because she also received threatening phone calls from Ms. Stone.

I told the mayor what was happening, and that because of the death of Ms. Stone's brother I would go to her house to discuss this with her.  I also planned to take Officers Jennings and Jones with me as witnesses.  Officer Jennings told me that he had seen Ms. Stone driving the white car a few days before.  This was in conflict with her claims that the car did not run.  As I began explaining to Ms. Stone the reason for my visit, she began cursing and pointing her finger in my face.  I eventually told her that I would not put up with her behavior.  Ms. Stone denied doing anything to Ms. Tice.  I returned to Big Al's and talked to Ms. Tice again.  I then learned that I had misunderstood part of the story.  I returned to Ms. Stone's and explained this to her.  I also confronted Ms. Stone about the fact that she claimed the car did not work, when, in fact, she had been seen driving it a few days earlier.  I interviewed witnesses who confirmed that the white car was working.

(Ryan Aff. ¶ 23.)  Stone acknowledged driving the Buick from her brother's home to her apartment on the day of his death.  (K. Stone Aff. ¶¶ 4-5.)  At that time one tire was bald with wires sticking out of it.  (Id. ¶ 5.)  Grand Junction fire chief Mike Bryan followed her home and, when the Buick stalled in her driveway, gave her a ride back to the café.  (Id. ¶¶ 6-7.)

According to the incident report prepared by Ryan, the threatening phone calls referred to in the report began shortly after Big Al's opened.  (Id., Ex. B.)  The report also reflected that, in denying the incident occurred, Stone stated that she "didn't do nothing to Susan Tice but the bitch stole our menu from her restaurant" and asked Ryan to talk to Tice again because they "needed to meet and get to the bottom of this because Susan Tice was a liar."  (Id.)  Ryan noted therein that he advised the women to stay away from each other or they could both be arrested.  (Id.)  Further, the report contained information that Ryan was advised by the vice mayor and other witnesses that they saw a white car on the same day as the alleged blocking incident.  (Id.)  The witnesses did not,

4

however, identify the driver except to report it was a white female.  (Id.)

Stone asserted in her affidavit that Ryan spoke to her about an accusation Tice had made that she blocked Tice with her small red vehicle at the post office and tried to start a fight with her.  (K. Stone Aff. ¶ 10.)  When she denied the allegation, he returned to Tice to confirm the details and came back, acknowledging that he got the story wrong and that Tice claimed Stone blocked her on a public street in Grand Junction with a white Buick.  (Id. ¶¶ 10-11.)  She denied this complaint as well, showing the police chief the Buick's flat tire and providing the names of persons who could corroborate her assertion that she was not driving the Buick on the date of the alleged incident.  (Id. ¶¶ 9, 12.)  Stone points to the affidavits of Robert Page, Karen Stanley, Benjamin Stone and Sarah Sartain which she claims evidence Ryan's knowledge that Tice's claims were false.

Page, who owns an auto repair shop in Grand Junction, stated in his affidavit that Stanley asked him to move the Buick to his shop for repairs and that he attempted to do so on July 30, 2008. (Aff. of Robert Page ("Page Aff.") ¶¶ 3, 5, 6, 8.)  Because of various problems with the car including the flat tire, Page had to make arrangements to have the vehicle towed to his shop, which did not occur until several weeks later.  (Id.)  Stanley, who was present when Ryan made his second visit to Stone's home on August 1, 2008, related that she told the chief that she had given the keys to her mechanic on July 30, 2008 and that the Buick at that time would not start and had a flat tire.  (Aff. of Karen S. Stanley ("Stanley Aff.") ¶ 4.)  Both Page and Stanley denied being questioned by Ryan or giving statements about whether the Buick was drivable on July 31, 2008.  (Page Aff. ¶ 11, Stanley Aff. ¶ 10.)  According to the affidavit of Benjamin Stone, the Plaintiff's nephew, his aunt did not have keys to the Buick on that day.  (B. Stone Aff., Ex.)  Sartain, hostess of the July 31, 2008 Bunco party, recalled in her affidavit that she was never interviewed by Ryan but that, perhaps a

5

month after the incident, Tice asked her to write a statement about seeing a white car[2] even though the vehicle she saw was light-colored instead of white and was not driven by Kelley Stone. (Aff. of Sarah Sartain ¶¶ 4, 8, 12, 13.) She stated that Tice provided the statement form to her and that she felt pressured to put a statement in writing. (Id. ¶ 9.)

On August 4, 2008, Stone's father, Bill Stone, addressed a meeting of the town's mayor and board of aldermen and requested an investigation of Ryan for, among other things, his handling of the interview with the Plaintiff on August 1, 2008. (Ryan Aff. ¶ 18.) Mr. Stone averred in his affidavit that he made the complaint because he feared Ryan would falsely arrest his daughter based on false information.[3] (Aff. of James W. Stone, Sr. ("B. Stone Aff.") ¶ 22.) On September 27, 2008, the board of aldermen held a special meeting to address the complaint raised by Mr. Stone, who did not appear. (Ryan Aff. ¶¶ 19-20.) After hearing Ryan's version of events, corroborated by Jennings and Jones, the board concluded that he was adequately trained and properly handled the issues raised by Mr. Stone. (Compl. ¶ 13; Ryan Aff. ¶ 24.)

On March 16, 2009, Tice and Stone were present at a local Exxon filling station at the same

---

[2]The Plaintiff also pointed to Mr. Stone's affidavit in which he stated that Smith told him Ryan neither took her statement nor verified it. (B. Stone Aff. ¶ 13.) He further claimed that Smith advised him Ryan never questioned her about the incident and that she spoke only with Tice. (Id. ¶ 15.) However, these statements are inadmissible hearsay. See Fed. R. Evid. 802. Thus, the Defendants' objection to consideration of these statements on summary judgment is granted.

[3]Mr. Stone stated in his affidavit that he met with Ryan at the café on September 8, 2008 to discuss the investigation. (B. Stone Aff. ¶ 10.) He related that Ryan admitted Tice told him the Plaintiff neither threatened nor cursed her but that she "imagined" the threats and curses. (Id. ¶ 11.) However, Ryan's alleged statement is inadmissible hearsay under the Federal Rules of Evidence. See Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]").

time. (Compl. ¶ 15.)  The store's security camera showed Stone's car leaving the parking lot some

forty seconds behind Tice's.  (Id.; B. Stone Aff. ¶ 16.)  Ryan submits that Tice told him she walked

into the store as Stone was going out. (Ryan Aff. ¶ 8.)  Plaintiff entered her car and backed it around

the side of the building so she faced the street.  (Id.)  Stone waited for Tice to leave the store and fell

in behind her as she exited the lot, following Tice down the street to her destination, Big Al's.  (Id.)

Tice reported that, when she arrived at the restaurant, the Plaintiff yelled obscenities at her and made

an obscene gesture.  (Id.)  Ryan reviewed the store video after interviewing Tice about the incident.

(Id. ¶ 9.)

A week later, the police chief prepared an affidavit of complaint in connection with the

encounter, in which he stated as follows:

> [O]n [March 16, 2009] at [approximately] 1[:]40 I received a call from Susan Tice
> in regards to Kell[e]y Stone following her again.  Upon arriving I spoke to Susan
> Tice[.  S]he advised me that she had went to the Exxon station to get some paper
> towels for Big Al's Restaurant when she pulled into the Exxon station Susan saw a
> vehicle parked on the side of the building that looked like Kell[e]y Stone's.  Susan
> got out of her car [and] went in [and] seen [sic] Kell[e]y Stone at the register when
> she walked in.  Susan got her stuff [and] went to the register[.  W]hile at the register
> Susan Tice looked out the window to [sic] or three times to see if Kell[e]y was
> leaving but she didn't.  Kell[e]y backed her car up [and] sat there until Susan came
> out of the store.  Susan got in her car [and] pulled out of the [parking lot] [and] when
> she did Kell[e]y Stone pulled in behind her [and] followed her to Big Al's.  When
> Susan got out of her [vehicle] Kell[e]y Stone yelled you sorry f--ing bitch [and] gave
> Susan the middle finger [and] kept going.  Kell[e]y Stone has done this in the past
> to Susan Tice.  The last incident Kell[e]y Stone had followed Susan Tice down
> Washington Street right on the bumper cursing [and] yelling at Susan.  There were
> witnesses who gave statements on this account.  Mrs. Tice didn't want to proceed
> with any charges because the Stone family had a death [and] she didn't want to put
> Kell[e]y's mom [and] dad through anymore.  Kell[e]y Stone has been warned on
> several occasions to leave Susan Tice alone.  The video at Exxon shows Kell[e]y
> following Mrs. Tice out of the [parking lot].

(Ryan Aff., Ex. A.)  A warrant was issued for Stone's arrest on the charge of stalking in violation

of Tennessee Code Annotated § 39-17-315.  (Id.)  Ryan stated in his affidavit that, before signing

7

the affidavit, he phoned assistant district attorney Joe Vandyke and shared the information he had collected in his investigation.  (<u>Id.</u> ¶ 14.)  He averred that he asked Vandyke's opinion as to whether Stone's behavior violated the statute and was told he had enough to charge her.  (<u>Id.</u>)

Stone's version of the incident is much more benign.  She claimed that, after she left the Exxon, she sat in her car and took a BC Powder she had just purchased for a broken tooth.  (K. Stone Aff. ¶ 14.)  Stone then checked her cell phone and left the lot, headed down Hardeman Street, on which Big Al's was located, to a clinic to have the tooth examined.  (<u>Id.</u>)  Finding the clinic too crowded, she asserted that she instead went to the post office and returned to the café.  (<u>Id.</u>)  Stone denied seeing Tice leave the Exxon, following her, yelling obscenities or making a gesture.  (<u>Id.</u> ¶15.)

Stone stated in her affidavit that she learned of the complaint on March 18, 2009 and phoned Ryan to ask if it was true.  (<u>Id.</u> ¶ 16.)  She averred that he advised her he was conducting an investigation and was not required to discuss it with her.  (<u>Id.</u>)  Ryan met with the Plaintiff six days later concerning the allegations, which Stone denied.  (Compl. ¶ 18.)  She was arrested and later released after posting a $5,000 bond.  (<u>Id.</u>)  Stone hired an attorney and made it known she was going to fight the charge.  (<u>Id.</u> ¶ 19.)

On May 11, 2009, after again consulting with Vandyke, Ryan swore out a second affidavit of complaint charging the Plaintiff with stalking, stating that

> [o]n [April 23, 2009] at [approximately] [3:45 p.m.] while on patrol I stopped at Al's Restaurant located at 250 Hardeman St.  They were doing some construction on the back of the building putting on a new deck.  I went outside where they were doing the construction.  Susan Tice, Mike Rice, Patrick Mitchell, Al Clifton, Matt Hixon are all out back.  I looked up [and] seen [sic] Kell[e]y Stone in her red car turn off of Hwy. 57 onto Hardeman St.  She was driving very slow [and] she went by.  Mike Rice was standing away from me toward the side of the building as Kell[e]y went by.  He stated to me Kell[e]y Stone was taking pictures with her cell phone of them.  I

seen [sic] Kell[e]y when she turned [and] went toward the post office but she didn't stop at the post office.  She went around the block, came back [and] pulled into Charles Auto Parts facing Al's Restaurant just sitting there looking towards Al's Restaurant.  Susan Tice yelled I'm so sick [and] tired of that bitch doing this sh--. I advised Susan Tice to calm down, I would take care of it.  [Approximately] [five] to [ten] minutes later I pulled down under a shade tree at 57 [and] Hardeman.  I seen [sic] Kell[e]y Stone again except this time she was in her dad's black truck.  She pulled into the Exxon [parking] lot next to the road [and] just sat there.  She didn't go into Exxon at all.  Chad Green, a [witness] drove by the Exxon [and] seen [sic] Kell[e]y Stone taking pictures of the people and back of the restaurant.  Kell[e]y Stone [illegible]  This is the [second] offense of stalking.

(Ryan Aff., Ex. A.)  A warrant was issued.  (Id.)

Ryan's recitation of events again conflicts with the Plaintiff's.  Stone has offered affidavits indicating that her red car was in fact parked at her parents' home in Saulsbury, Tennessee, some fifteen miles from Grand Junction on that date and that the cell phone she was using at the time was not capable of taking photographs.  (*See* K. Stone Aff. ¶¶ 19, 22 & Ex. C; B. Stone Aff. ¶¶ 17-18.)[4] She further stated as follows:

I went to the post office to mail change of address cards and then drove down Hardeman Street toward Charlie's Auto.  At the intersection of Hardeman St. and Hwy 57, I had to back my dad's truck up to allow Chad Green to turn onto Hardeman St.  I then proceeded to Charlie's Auto Parts to make a set of keys.  Charlie's was closed.  As I headed toward my new apartment, I pulled into the Exxon parking lot for a phone call because I do not drive and talk on the phone.

While I was sitting in the Exxon parking lot I heard Susan Tice screaming loudly at me from the porch of her restaurant.  She was cursing and flipping me off.  I held my cell phone out the window so my sister, Karen, could also hear Tice.  Chief Ryan was standing next to Tice as she did this.  I then saw Ryan run to his car and pull it under the big tree at the corner of Hardeman St. and Hwy. 57.  I finished my phone

---

[4]The Plaintiff also cited to the affidavit of her mother, Sarah U. Stone.  The Defendants have objected to Stone's reliance on this affidavit in support of her response to the motion for summary judgment on the grounds that the affiant was not properly disclosed as a witness.  (*See* Pat Ryan & Grand Junction's Notice of Objections to Affs. Filed by Kelley S. Stone at 2.) However, as the Court need not consider Sarah Stone's affidavit in rendering its decision, the objection is denied as moot.

call with my sister and went home.  I did not drive slowly by Big Al's.

(K. Stone Aff. ¶¶ 20-21.)

Stone also produced the affidavit of Albert Clifton, who asserted therein that Ryan was in the restaurant's kitchen when Tice, who was outside, began screaming for him, saying "You missed her!  That bitch just drove by taking pictures on her cell phone!"  (Aff. of Albert J. Clifton ¶¶ 5-6.) When Stone drove by again in her father's truck at what Clifton described as normal speed some five to ten minutes later, Tice yelled, "You better stop driving by my restaurant you stupid bitch," while waving her arms and shaking her finger.  (Id. ¶¶ 7, 10, 12.)  Ryan told Tice to stop and she replied, "What am I supposed to do?  That bitch just drove by again!"  (Id. ¶ 8.)  Ryan responded, "Just don't do it in front of me."  (Id.)  Clifton did not see Stone taking photos with her cell phone.  (Id. ¶ 11.)

On April 24, 2009, Ryan took the second warrant to Bolivar where Stone was scheduled to appear on the initial stalking charge.  (Compl. ¶ 21.)  The case was continued to June 9, 2009 for a preliminary hearing but, in light of the second charge, she was again arrested and released after posting an additional $5,000 bond.  (Id. ¶ 23.)

Ryan stated in his affidavit that he, Tice and her husband met with Vandyke on July 20, 2009 and that he had subpoenas for witnesses supporting the charges.  (Ryan Aff. ¶ 16.)  Vandyke advised that he need not worry about having witnesses present, as Ryan and Tice's testimony and the evidence would be sufficient to bind Stone over to the grand jury.  (Id.)  The Plaintiff claims that Ryan made statements that he knew would get back to her to the effect that if she or anyone else testified in contradiction to the facts alleged in the second affidavit he would arrest them for perjury. (Compl. ¶¶ 24-25.)  He also began "patrolling" her restaurant, her home, and the cemetery when she visited her brother's grave.  (Id. ¶ 26.)  The stalking charges were eventually dismissed.  (Ryan Aff.,

10

Ex. A.)  It is Stone's position that Ryan and Tice concocted the story that the Plaintiff was stalking Tice and conspired to deprive her of her constitutional rights in retaliation for her family's criticism of Ryan and the resulting embarrassment he suffered.  (Compl. ¶ 16.)

*ANALYSIS OF THE PARTIES' CLAIMS*

Federal Claims.

In order to prevail on a claim under § 1983, a plaintiff "must establish that a person acting under color of state law deprived [her] of a right secured by the Constitution or laws of the United States."  Radvansky v. City of Olmsted Falls, 395 F.3d 291, 302 (6th Cir. 2005) (quoting Waters v. City of Morristown, 242 F.3d 353, 358-59 (6th Cir. 2001)).  As noted above, the constitutional violation alleged here concerns the Fourth Amendment, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

*Fourth Amendment Claims Against the City.*

While municipalities may not be held vicariously liable under § 1983 for the actions of their employees, they "may be held directly liable for a constitutional violation committed through a [municipal] policy or practice."  Jones v. Muskegon Cnty., 625 F.3d 935, 946 (6th Cir. 2010), *reh'g denied* (Dec. 14, 2010) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) & City of St. Louis v. Praprotnik, 485 U.S. 112, 121, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)).  "[M]unicipalities may be held liable under § 1983 when the injury inflicted is a result of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy." Frontera v. City of Columbus Div. of Police, 395 F. App'x 191, 194 (6th Cir. 2010) (quoting Radvansky, 395 F.3d at 311) (internal quotation marks omitted). "In addition, there must be a direct causal link between the policy and the alleged constitutional violation such that the municipality's deliberate conduct can be deemed the moving force behind the violation." Id. (quoting Radvansky, 395 F.3d at 311) (internal quotation marks omitted). Thus, a plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [her] particular injury was incurred due to execution of that policy." Id. at 195 (quoting Alkire v. Irving, 330 F.3d 802, 815 (6th Cir. 2003)).

The Plaintiff maintains that the City had a custom of deliberate indifference regarding police officers' abusive misconduct toward its citizens and of failing to take action to stop such misconduct. She further insists that Ryan's action constituted a policy or custom of deliberate indifference to her rights and that he executed his final decision-making authority in making out the affidavits of complaint against her.

Courts have identified at least four avenues a plaintiff may utilize in establishing municipal liability. Spears v. Ruth, 589 F.3d 249, 256 (6th Cir. 2009). "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision[5]; or (4) a custom of tolerance or acquiescence of federal rights violations." Id. (quoting Thomas v. City of

---

[5]The issue of training was raised in the Defendants' motion for summary judgment. In response, Stone acknowledges that Ryan's training was adequate, but alleges that he did not apply his training when dealing with her. The City cannot be held liable on the grounds of *respondeat superior*. See Connick v. Thompson, ___ S. Ct. ___, 2011 WL 1119022, at *6 (U.S. Mar. 29, 2011).

12

Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)).  The focus in this case appears to be on the fourth. "'Official policy' often refers to formal rules or understandings -- often but not always committed to writing -- that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Id. (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).  "A municipality can be shown to have a 'custom' causing constitutional violations, even if that custom was not formally sanctioned, provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice." Id. (citing Monell, 436 U.S. at 690-91, 98 S. Ct. 2018).  A custom must be a "widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law." McClendon v. City of Detroit, 255 F. App'x 980, 982 (6th Cir. 2007) (citing Praprotnik, 485 U.S. at 127, 108 S. Ct. 915).  "In turn, the notion of 'law' must include deeply embedded traditional ways of carrying out state policy." Cash v. Hamilton Cnty. Dep't of Adult Prob., 388 F.3d 539, 543 (6th Cir. 2004) (quoting Doe v. Claiborne Cnty., Tenn. by & through Claiborne Cnty. Bd. of Educ., 103 F.3d 495, 507-08 (6th Cir. 1996)), cert. denied, 546 U.S. 927, 126 S. Ct. 396, 163 L. Ed. 2d 274 (2005) & 546 U.S. 998, 126 S. Ct. 545, 163 L. Ed. 2d 499 (2005).

In order to prevail on a "tolerance or acquiescence" theory, the plaintiff must demonstrate, by a preponderance of the evidence, that "there was a clear and persistent pattern of illegal activity; the [municipality] had notice of it; the [municipality] tacitly approved the unconstitutional activity such that its deliberate indifference amounts to an official policy of inaction; and this custom or policy of inaction was the moving force behind the constitutional deprivation." Aureus Holdings, Ltd. v. Detroit City, 303 F. App'x 265, 270 (6th Cir. 2008) (citing Thomas, 398 F.3d at 429), cert. denied, ___ U.S. ___, 129 S. Ct. 2387, 173 L. Ed. 2d 1295 (2009), reh'g denied ___ U.S. ___, 130

S. Ct. 23, 174 L. Ed. 2d 607 (2009).  "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 2011 WL 1119022, at *7 (quoting Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).  A plaintiff bears a heavy burden in establishing municipal liability.  Thomas, 398 F.3d at 433.  Bald allegations of the existence of a policy or a failure to produce evidence of a pattern of similar activity are insufficient to survive summary judgment.  Aureus Holdings, Ltd., 303 F. App'x at 270-71.

The Plaintiff presents an affidavit of complaint prepared by Ryan against Albert Clifton on the charge of stalking, which allegedly occurred on or about March 28, 2009.  (Pl.'s Resp. to Def.'s Mot. for Summ. J.:  Sections G & H, Ex. 10.)  Stone also proffers the deposition testimony of Cheryl Smith, in which she stated that a Grand Junction resident, presumably Clifton, had been arrested for stalking in connection with allegations that he had violated a restraining order obtained by his female next door neighbor.  (Dep. of Cheryl Smith at 26-27.)  According to Smith, he was in a local convenience store when the woman entered the premises.  (Id. at 27.)  Smith recalled that "before he could get out, she was accusing him of following her and stalking her.  And so he was arrested." (Id.)  In her opinion, hauling people off to jail for stalking under the circumstances involving Clifton or Stone was "heavy-handed."  (Id. at 27-28.)  Smith opted not to voice her concerns to the other board members or to the mayor for fear she would get the "cold shoulder."  (Id. at 29.)  Grand Junction was, after all, a "small town" where "[i]f you have an opinion that is not the popular opinion, then you -- it's just not good."  (Id.)

The Court finds that, assuming the arrests of Stone and Clifton for stalking were unlawful, these incidents -- three in an isolated period lasting less than two months -- do not demonstrate that

14

the City had a custom of permitting unconstitutional arrests for stalking "so widespread, permanent, and well settled as to have the force of law" and that it was a "deeply embedded traditional way[] of carrying out state policy" in Grand Junction.  *See* <u>Cash</u>, 388 F.3d at 543, *supra*; <u>McClendon</u>, 255 F. App'x at 982, *supra*.  This is particularly true considering that two of the three incidents do not go beyond the facts of Stone's own case.  *See* <u>Thomas</u>, 398 F.3d at 433-34 (plaintiff's evidence of a pattern was based on the facts of his own case, which threatened to collapse the municipal liability standard into one based on *respondeat superior*; summary judgment appropriate as plaintiff failed to show "several separate instances of the alleged rights violation").  At worst, the evidence suggests that for a brief period Ryan viewed stalking as the crime *du jour*.

To the extent Stone claims municipal liability based on Ryan's status as a policymaker, this assertion also fails.  Municipal liability may be imposed for a single decision by a municipal policymaker under appropriate circumstances where he "possesses final authority to establish municipal policy with respect to the action ordered." <u>Pembaur</u>, 475 U.S. at 481, 106 S. Ct. at 1299; <u>Nance v. Wayne Cnty.</u>, No. 1:08-0043, 2009 WL 3245399, at *10 (M.D. Tenn. Oct. 2, 2009). "[M]ere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." <u>Miller v. Calhoun Cnty.</u>, 408 F.3d 803, 814 (6th Cir. 2005) (quoting <u>Feliciano v. City of Cleveland</u>, 988 F.2d 649, 655 (6th Cir. 1993)).  "Consideration should be given to whether the employee formulates plans for the implementation of broad goals." <u>Id.</u> (quoting <u>Hager v. Pike Cnty. Bd. of Educ.</u>, 286 F.3d 366, 376 (6th Cir. 2002)).  The Sixth Circuit has held that municipal liability may only be imposed where the city official was "acting in a policymaking capacity" at the time the alleged constitutional violation

occurred and whose conduct could be characterized as "exercising a power to set policy." Wooten v. Logan, 92 F. App'x 143, 146-47 (6th Cir. 2004).  For example, a sheriff acting in the guise of a patrol officer making a traffic stop, not as a chief law enforcement officer, is not "exercising a power to set policy." Id.; *see also* Butler v. City of Englewood, No. 1:07-cv-184, 2008 WL 4006786, at *11 (E.D. Tenn. Aug. 25, 2008).  In this case, the Plaintiff has not demonstrated that Ryan was a final policymaker or that he was acting in a policymaking capacity when he swore out the affidavits of complaint against her.  Accordingly, she has failed to establish a basis for municipal liability. *See* Butler, 2008 WL 4006786, at *11 (plaintiff's failure to offer evidence to suggest defendant chief of police was acting in his policymaking capacity at the time of her arrest was fatal to her municipal liability claim).

*Fourth Amendment Claims Against Ryan.*

As previously stated herein, Ryan has invoked the defense of qualified immunity in response to Stone's § 1983 claim.  "Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights." Bishop v. Hackel, ___ F.3d ___, 2011 WL 291951, at *4 (6th Cir. 2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "Qualified immunity is intended to serve the public interest by permitting officials to take action with independence and without fear of consequences." Crockett v. Cumberland Coll., 316 F.3d 571, 579 (6th Cir. 2003) (quoting Harlow, 457 U.S. at 819, 102 S. Ct. 2727) (internal quotation marks omitted).  "A defendant is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." Coble v. City of White

House, Tenn., ___ F.3d ___, 2011 WL 475008, at \*5 (6th Cir. 2011) (citing Aldini v. Johnson, 609 F.3d 858, 863 (6th Cir. 2010)) (internal quotation marks omitted).  "Under the 'clearly established' inquiry, the question is whether the right was so clearly established that a reasonable official would understand that what he is doing violates that right."  Jefferson v. Lewis, 594 F.3d 454, 460 (6th Cir. 2010) (citing Parsons v. City of Pontiac, 533 F.3d 492, 500 (6th Cir. 2008)) (some internal quotation marks omitted).  The elements may be considered in any order.  Pucci, 628 F.3d at 765 n.11 (citing Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009)).  The plaintiff bears the burden of showing that the officer is not entitled to qualified immunity.  Coble, 2011 WL 475008, at \*5 (citing Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir. 2010)).

Stone has alleged that Ryan lacked probable cause to arrest her.  "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."  Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010) (quoting Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir. 2005)).

> Because an arrest based on a facially valid warrant approved by a magistrate provides a complete defense, [the plaintiff], in order to prevail on a false-arrest claim, [is] required to prove by a preponderance of the evidence that in order to procure the warrant, [the officer] knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause.

Id. (internal citations & quotation marks omitted).  "If the affidavit contains false statements or material omissions, [the court is to] set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause."  Id. (citing Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir. 1989)).

"Probable cause is defined as reasonable grounds for belief, supported by less than prima

17

facie proof but more than mere suspicion."  Id. at 306 (quoting United States v. McClain, 444 F.3d 556, 562 (6th Cir. 2005)).  "[P]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  Crockett, 316 F.3d at 582 (quoting Adams v. Williams, 407 U.S. 143, 149, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)).  "A police officer has probable cause only when he discovers *reasonably reliable information* that the suspect has committed a crime."  Parsons, 533 F.3d at 500 (citing Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000).  In determining the existence of probable cause, the court is to examine the totality of the circumstances and whether the "facts and circumstances" to which the officer "had knowledge at the moment of the arrest were sufficient to warrant a prudent person in believing that the seized individual had committed an offense."  Sykes, 625 F.3d at 306 (citing Hinchman v. Moore, 312 F.3d 198, 204 (6th Cir. 2002)) (internal quotation marks omitted).

An arrest based on probable cause does not become invalid simply because the charges are subsequently dismissed.  Manley v. Paramount's Kings Island, 299 F. App'x 524, 530 (6th Cir. 2008) (citing Williams ex rel. Allen v. Cambridge Bd. of Educ., 370 F.3d 630, 638 (6th Cir. 2008)).  A state court's dismissal does not bind a federal court in a later § 1983 action.  Id. at 530-31 (citing Voyticky).

"Once probable cause is established, . . . an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.  In fact, law enforcement is under no obligation to give any credence to a suspect's story or alibi nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."  Williams, 370 F.3d at 637 (quoting Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir. 1999)) (internal quotation marks omitted).  "At the same time, officers must

18

consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause.  Id. (citing Ahlers, 188 F.3d at 372) (internal quotation marks omitted).  "A mere suspicion of criminality will not suffice."  Id. (citing United States v. Harris, 255 F.3d 288, 292 (6th Cir. 2001)) (internal quotation marks omitted).

Under Tennessee law, "[a] person commits an offense who intentionally engages in stalking." Tenn. Code Ann. § 39-17-315(b)(1).  "Stalking" is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested."  Tenn. Code Ann. § 39-17-315(a)(4).  A "course of conduct" is a "pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose."  Tenn. Code Ann. § 39-17-315(a)(1).  "Harassment" "means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress.  Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose."  Tenn. Code Ann. § 39-17-315(a)(3).  Finally, "unconsented contact" is

> any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued.  Unconsented contact includes, but is not limited to, any of the following:
>
> (A)   Following or appearing within the sight of that person;
>
> (B)   Approaching or confronting that person in a public place or on private property;

(C)   Appearing at that person's workplace or residence;

(D)   Entering into or remaining on property owned, leased, or occupied by that person;

(E)   Contacting that person by telephone;

(F)   Sending mail or electronic communications to that person; or

(G)   Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

Tenn. Code Ann. § 39-17-315(a)(5).

The proof presented in this case sets out a classic scenario of he said/she said. Stone has asserted facts that call into question whether Ryan violated a clearly established right under the Fourth Amendment and whether his actions were reasonable. Thus, summary judgment grounded in qualified immunity is not appropriate.

<u>State Claims.</u>

*Malicious Prosecution.*[6]

Under Tennessee law, "[a] claim for malicious prosecution exists where: (1) a civil or criminal action [was] instituted against the plaintiff without probable cause, (2) with malice, and (3)

---

[6]Regretfully, it is unclear from the complaint whether Stone intended to assert a federal malicious prosecution claim under the Fourth Amendment or one pursuant to state law. In his dispositive motion, Ryan seeks dismissal of the claim citing only to Tennessee law. Stone, although citing no law at all, does not take issue with the Defendant's apparent characterization. The Court is therefore left to assume the malicious prosecution claim is a state law claim. This assumption also finds support in the complaint, which alleges malicious prosecution in the first count followed by allegations of other causes of action that are clearly grounded in state law. The final count alleges federal § 1983 claims. This placement appears to suggest Stone's intention to assert a state claim. *See* <u>Evans v. City of Etowah</u>, No. 1:06-cv-252, 2008 WL 918515, at *8 (E.D. Tenn. Apr. 3, 2008) (relying on plaintiff's placement of malicious prosecution claim with state law claims in complaint to determine that, reasonably read, plaintiff intended to plead only a state cause of action rather than one under § 1983), *aff'd in part by* 312 F. App'x 767 (6th Cir. 2009).

the action is terminated in plaintiff's favor." B.M.D. ex rel. Dickerson v. Knox Cnty., Tenn., No. 3:07-CV-73, 2009 WL 677776, at *13 (E.D. Tenn. Mar. 10, 2009) (citing Roberts v. Federal Express Corp., 842 S.W.2d 246, 247-48 (Tenn. 1992)).  The instant motion for summary judgment focuses on the third factor.

> "Favorable termination" has been defined as follows:
>
> [I]f the manner of termination, including dismissal, reflects negatively on the merits of the case, it will be considered favorable to the defendant.  More specifically, if the dismissal somehow indicates that the defendant is innocent of wrongdoing, it will be considered a favorable termination  On the other hand, if the reason for dismissal is "not inconsistent" with a defendant's wrongdoing, it will not be considered a favorable termination  If the circumstances surrounding dismissal are ambiguous on this point, the determination should be left for trial.

Lane v. Becker, ___ S.W.3d ___, 2010 WL 669243, at *4 (Tenn. Ct. App. 2010), *app. denied* (Nov. 29, 2010) (quoting Parrish v. Marquis, 172 S.W.3d 526, 531 (Tenn. 2005)).  "[N]ot just *any* outcome favorable to the original defendant will support the favorable termination element."  Anderson v. Wal-Mart Stores, Inc., No. 1:07-00024, 2008 WL 1994822, at *4 (M.D. Tenn. May 2, 2008) (quoting Parrish, 172 S.W.3d at 533) (internal quotation marks omitted).  Instead, the termination "must also reflect the merits and not merely a procedural victory." Parrish, 172 S.W.3d at 531.  "If a court concludes that the termination does not relate to the merits -- reflecting on neither innocence of nor responsibility for the alleged misconduct -- the termination is not favorable in the sense that it would support a subsequent action for malicious prosecution."  Id. (internal quotation marks omitted).  "In determining whether a specific result was a favorable termination, a court must examine the circumstances of the underlying proceeding."  Id.

Ryan stated in his affidavit that

> [n]either he, nor Ms. Tice was a part of the conversation on July 21, 2009, between the assistant district attorney and Ms. Stone's attorney. During this conversation the two of them apparently came to some type of agreement for the charges to be dismissed. When the judge dismissed the charges, he entered a mutual no contact order preventing Ms. Tice and Ms. Stone from having contact with each other.

(Ryan Aff. ¶ 15 & Ex. A.) In the "Judgment" section of the form completed by the general sessions judge of Hardeman County, Tennessee, he checked the box indicating that the case was dismissed. (Id., Ex. A.) The judge also noted therein that the matter had been dismissed on the recommendation of the district attorney and wrote at the bottom "mutual no contact if violation charge contempt of court on citation only." (Id.)

"While various modes of termination can be construed as favorable to an accused, a cause dismissed pursuant to a compromise and/or settlement is an indecisive termination and, thus, cannot sustain an action for malicious prosecution." Mitchem v. City of Johnson City, No. 2:08-CV-238, 2010 WL 4363399, at *6 (E.D. Tenn. Oct. 27, 2010) (quoting Bowman v. Breeden, 1988 WL 136640, at *2 (Tenn. Ct. App. Dec. 20, 1988)), supplemented by 2010 WL 4362550 (E.D. Tenn. Oct. 28, 2010).

> The reason for the rule is said to be, either that there is in such cases such an admission of probable cause that the [p]laintiff cannot afterwards retract it and try the question which he waived by the settlement, regardless of the validity or invalidity of the compromise, or that the accused, having consented to a termination which leaves open the question of his guilt and possible conviction cannot take advantage of it.

Id. (quoting Bowman, 1988 WL 136640, at *2).

Stone vehemently denies the existence of any agreement, stating in her affidavit that "I did not accept any kind of deal from the prosecutor, I did not pay a fine, I was not put on probation, and I did not agree to a no contact order." (K. Stone Aff. ¶ 29.) In further support of her assertion that the favorable termination prong has been met, the Plaintiff points to her affidavit, in which she

averred that "[t]he judge called my case and said, 'Ms. Stone, clearly no law has been broken here. I am dismissing these charges.  I am issuing a no contact order between you and Ms. Tice.  Don't be taking short cuts down side streets, or driving in front of each other's businesses or homes.'"  (Id. ¶ 27.)  She claims the judge repeated his statement to Ryan, adding, "If you feel the need to arrest her again you will write a citation, bring them to court and I will decide if it's an arrestable charge." (Id. ¶ 28.)  Stone's assertions with respect to the general sessions judge's statements are, of course, hearsay and, therefore, inadmissible.[7]  See Fed. R. Evid. 802.

Considering all the circumstances of the underlying proceeding, the Court is of the opinion that there is sufficient ambiguity to render it appropriate to leave a determination on the favorable termination element in the hands of the jury.  See Lane, 2010 WL 669243, at *4.

*False Imprisonment.*

Ryan maintains that he is immune from suit for false imprisonment under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tennessee Code Annotated §§ 29-20-101, *et seq.*  The statute removes immunity from suit of governmental entities

> for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of . . . false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights[.]

Tenn. Code Ann. § 29-20-205.  Immunity remains removed as to governmental entities for all intentional torts not listed among the exceptions specifically set forth in the statute.  Carpenter v. Doe, No. 10-2425-STA, 2010 WL 4922640, at *11 (W.D. Tenn. Nov. 29, 2010) (citing Limbaugh

---

[7]The Defendants' objection to ¶¶ 27 and 28 of Kelley Stone's affidavit is therefore granted.

23

v. Coffee Med. Ctr., 59 S.W.3d 73, 82 (Tenn. 2001)).  Thus, governmental immunity is removed for

claims of false imprisonment generally, where not pursuant to a mittimus from a court.  Id.

> Under the TGTLA, if the governmental entity at issue is amenable to suit -- in other
> words, if immunity has been removed by § 29-20-205 -- then the entity is the proper
> party[-]defendant, and the entity's employees are immune from suit. . . .  Conversely,
> if the governmental entity is not amenable to suit -- in other words, if immunity has
> not been removed by § 29-20-205 -- then employees of the entity are property party-
> defendants.

Wilkerson v. Chattanooga, No. 1:09-cv-168, 2010 WL 2735689, at *13 (E.D. Tenn. July 12, 2010).

Ryan maintains that, since Stone's arrest was made pursuant to a warrant, and not a mittimus from

a court, he cannot be sued for damages.

In response, the Plaintiff agrees that her claim against Ryan did not arise from a mittimus

from a court.  Rather, she submits the claim arose out of civil rights.  Thus, the argument goes, the

City is immune from suit but Ryan is not.  The TGTLA's "civil rights" exception to the removal of

immunity has been construed to encompass claims arising from § 1983 and the United States

Constitution.  Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010), cert. denied ___ S.

Ct. ___, 79 U.S.L.W. 3344, 79 U.S.L.W. 3467, 79 U.S.L.W. 3475, 2011 WL 588979 (U.S. Feb. 22,

2011).  The Plaintiff's claims herein arise from § 1983.  Under the statute, immunity of the City

would not be removed as to those civil rights claims.  See Tenn. Code Ann. § 29-20-205.  Therefore,

Ryan is a proper party defendant and his basis for dismissal is without merit.  See Wilkerson, 2010

WL 2735689, at *13, supra.

*CONCLUSION*

The motion for summary judgment is GRANTED as the Plaintiff's claims against the City

of Grand Junction.  The remainder of the motion is DENIED.  Furthermore, the Defendants'

objections to affidavits filed by the Plaintiff are GRANTED IN PART AND DENIED IN PART as specified herein.

IT IS SO ORDERED this 31st day of March 2011.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE